## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

LIGHTING SOLUTIONS GROUP, LLC
d/b/a SpecGrade LED,

RICK NATHANS, and

GERALD LAUCK,

                *Plaintiffs,*           Case No. 2:23-cv-02082

        v.

RL SWEARER CO., INC.,               **Judge Michael H. Watson**
        *Defendant,*         **Magistrate Judge Kimberly A. Jolson**

        v.

SEKO WORLDWIDE, LLC,
            *Defendant,*
        v.

XPO LOGISTICS, INC., RXO FREIGHT
FORWARDING, Inc.
            *Defendants,*
        v.
MEGAN NOVAK,
            *Defendant,*
        v.
KURT BOWERIZE,
            *Defendant,*
        v.
JON MURDOCK
            *Defendant,*

        v.
PAUL DEKU,
            *Defendant,*
        v.
STACIE DAMON
            *Defendant.*

## PLAINTIFFS LIGHTING SOLUTIONS GROUP, LLC, RICK NATHANS AND GERALD LAUCK'S VERIFIED AMENDED COMPLAINT FOR DAMAGES

1

**(Jury demand endorsed herein)**

NOW COME Plaintiffs, Lighting Solutions Group, LLC, d/b/a SpecGrade LED, ("SpecGrade"), Rick Nathans ("Nathans") and Gerald Lauck ("Lauck") (together herein "Plaintiffs") by and through the undersigned counsel, and for Complaint against Defendant RL Swearer, Co., Inc. ("RLS"),  Defendant Paul Deku ("Deku), Defendant Stacie Damon ("Damon"), Defendant SEKO Logistics, Inc., ("SEKO"), Defendant XPO Logistics, Inc., Defendant, RXO Freight Forwarding, Inc. ("XPO/RXO"), Defendant Megan Novak ("Novak"), Defendant Kurt Bowerize ("Bowerize") and Defendant Jon Murdock ("Murdock") (together "Defendants") hereby state as follows:

## THE PARTIES

1.     Plaintiff, SpecGrade is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 639 Eastgate Parkway, located in Gahanna, Franklin County, Ohio 43230.

2.     Plaintiff, Rick Nathans is an individual in the State of Ohio who resides at 2512 Keltonhurst Court, located in Blacklick, Franklin County, Ohio 43004.

3.     Plaintiff Gerald Lauck is an individual in the State of Ohio who resides at 330 Morgan Lane, located in Gahanna, Franklin County, Ohio 43230.

4.     Defendant RLS at all times pertinent hereto, was and is a duly organized and validly existing Corporation under the laws of the State of Pennsylvania located at 115 McLaughlin Road in Coraopolis, Pennsylvania 15108.

5.     RLS at all times pertinent hereto operates a Cleveland, Ohio office located at 6675 Eastland Road, Suite A in Middleburg Heights, Ohio 44130.

6.    RLS at all times pertinent hereto represented that its employee Defendant Deku, assigned to Plaintiffs' account was employed in its Cincinnati, Ohio office located at 463 Erlanger Road in Erlanger, Kentucky 41018. Defendant authorized Deku to confirm and represent himself as such.

7.    Defendant SEKO at all times pertinent hereto, was and is a duly organized and validly existing Limited Liability Company under the laws of the State of Illinois located at 1501 East Woodfield Road, Suite 210E, Schaumburg, Illinois 60173.

8.    SEKO at all times pertinent hereto operates a Columbus, Ohio office located at 600 Claycraft Road, Columbus, Ohio 43230.

9.    Defendant XPO Logistics, Inc. at all times pertinent hereto, was and is a duly organized and validly existing Corporation under the laws of the State of Connecticut located at 5 American Lane, Greenwich, Connecticut 06831.

10.    XPO at all times pertinent hereto, operates a Columbus, Ohio office located at 1110 A Claycraft Road, Columbus, Ohio 43230.

11.    Defendant RXO, which previously operated XPO Global Forwarding, Inc., at all times pertinent hereto, was and is a duly organized and validly existing Corporation under the laws of the State of Delaware located at 11215 N. Community House Road, Charlotte, North Carolina 28277.

12.    RXO at all times pertinent hereto operates a Columbus, Ohio office located at 1110 A Claycraft Road, Columbus, Ohio 43230.

13.    Defendant Megan Novak is an individual in the State of Ohio who resides at 15323 Hartford Road, located in Delaware County, Ohio 43074.

14.     Defendant Kurt Bowerize is an individual in the State of Ohio who resides at 6291 Beringer Drive, located in Franklin County, Westerville, Ohio 43082.

15.     Defendant Jon Murdock is an individual in the State of Ohio who resides at 279 Fullers Circle, located in Fairfield County, Pickerington, Ohio 43147.

16.     Defendant Paul Deku is an individual working at RLS' Cincinnati, Ohio office who resides at 1038 Shadowridge Drive, located in Kenton County, Kentucky 41018.

17.     Defendant Stacie Damon is an individual working at RLS' Cincinnati, Ohio office who resides at 108 Indian Creek Drive, located in Kenton County, Kentucky 41017.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this case pursuant to 28 U.S.C. Section 1332(a) because Plaintiffs and the Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

19.     Venue is proper in this Court under 28 U.S.C. §1391(b) as it is the judicial district in which Plaintiffs reside.

20.     Venue is proper in this Court because Defendants conduct business in the State of Ohio. Defendants and their employees sent information to and received responsive communications from the Plaintiffs in this state.

21.     Specifically, RLS regularly conducted business in this District with Plaintiffs. This is the judicial district in which Plaintiffs and Defendant entered into the Customs Power of Attorney at issue here. This is the district in which Defendant accepted payment from Plaintiffs.

22.     Venue is further proper in this District because it is the location where substantially all of the events giving rise to the claims asserted herein occurred.

**FACTUAL ALLEGATIONS**

23.     Plaintiff SpecGrade is an importer and United States manufacturer of LED lighting known for reputable UL and ETL certified electrical products and customer service in the lighting industry.

24.     Plaintiff Nathans serves as SpecGrade's managing partner.

25.     Plaintiff Lauck serves as SpecGrade's president.

26.     According to the United States Department of Commerce International Trade Administration, customs brokers are private individuals, partnerships, associations or corporations, licensed and regulated by US Customs and Border Protection ("CBP") to assist importers in meeting federal requirements governing imports into the United States. (*See* https://www.trade.gov/customs-brokers-and-freight-forwarders).

27.     The Customs Modernization and Informed Compliance Act (the "Mod Act") was enacted by Congress in 1993 as a way to update, modernize and streamline existing border clearance processes. The law obligates CBP to provide information concerning the trade community's responsibilities and rights under customs-related laws.

28.     Pursuant to 19 U.S.C. 1484, the importer of record is responsible for using "reasonable care" to enter, classify and value imported merchandise.

29.     Here, Plaintiff SpecGrade is classified as the importer of record, however, Plaintiff appointed RLS by way of the Power of Attorney to make all CBP declarations on its behalf as its customs broker with its specialized knowledge, which it held itself out as having and was being compensated for.

30.     RLS purports to be a "Customs broker…with a global reach that keeps it simple." According to RLS' website, RLS "leverages [their] expertise and technology to get this done for [their] customers every day." (*See* https://www.rlswearer.com/CustomsBrokerage.asp).

31.     RLS claims "As the conduit between the shipper and various departments of CBP, [RLS] takes the information about your products, the financial transactions between you and your international supplier or customer and presents that information to CBP with the correct classification, value and duty assessment in the proper format." *Id.*

32.     Based on these representations about RLS expertise, on or about December 17, 2015, SpecGrade contracted with RLS to serve as Plaintiffs' customs broker, responsible for, among other things, the classification of imported items with applicable Harmonized Tariff Schedule ("HTS") codes and values to ensure compliance with the United States CBP requirements. (*See* **Exhibit A, Customs Power of Attorney**). ("the Agreement").

33.     The Customs Power of Attorney at issue here (Ex. A) it purports to include Terms and Conditions of Service, which are allegedly an industry standard agreement "Approved by the National Customs Brokers and Forwarders Association of America, Inc. (Revised 02/13)." It is unclear whether or not the Plaintiffs ever signed or initialed these Terms and Conditions of Service constituting the Plaintiffs' acceptance of the Terms and Conditions of Service.

34.     The Harmonized Tariff Schedule of the United States ("HTS") sets out the tariff rates and statistical categories for all merchandise imported into the United States. Every item imported into the United States falls under a unique HTS Code.

35.     The HTS is an internationally standardized system of names and numbers that classifies traded products. The HTS is organized by economic activity or component material.

36.     The HTS is organized into 21 sections, which are subdivided into 96 chapters and as of 2022, those chapters are further subdivided into 1,228 headings and 5,612 subheadings.

37.     Section and chapter titles describe broad categories of goods, while headings and subheadings describe products in greater detail.

38.     Plaintiffs contracted with RLS to perform these classifications because of RLS' purported knowledge, experience and expertise as RLS specifically represents on its website: "We clear every shipment with expertise and personal attention. Our brokerage experts are dedicated to monitoring the latest import and export compliance laws and regulations. We have developed an integral working relationship with CBP and other U.S. regulatory agencies for the best solution to all of your Customs clearance needs, offering our repeat customers a streamlined process that facilitates the movement of their most frequently shipped goods through CBP." (*See* https://www.rlswearer.com/CustomsBrokerage.asp).

39.     The Plaintiffs also utilized a freight forwarding and logistics company to serve as an intermediary for all documentation, information, questions and billing related to the shipment of Plaintiffs' overseas imports to the United States.

40.     The freight forwarding and logistics company intermediary would then communicate relevant information including invoices and Bills of Lading to RLS in order for RLS to complete the required CBP paperwork for each of the Plaintiffs' imports.

41.     From November 2015 until early 2021 the Plaintiffs utilized XPO/RXO to serve as their freight forwarding and logistics intermediary.

42.     The Plaintiffs' main point of contact at XPO/RXO was Defendant Novak who held herself out as the "XPO Logistics Station Owner."

43.     In her role as XPO Logistics Station Owner, Novak recommended that the
Plaintiffs utilize RLS to serve as their Customs Broker of Record to conduct Customs Business
on behalf of the Plaintiffs, pursuant to 19 CFR §111.1, which defines Customs Business as
"those activities involving transactions with CBP concerning the entry and admissibility of
merchandise, its classification and valuation, the payment of duties, taxes or other charges
assessed or collected by CBP on merchandise by reason of its importation…"

44.     19 CFR §111.1 also defines Customs Business as the "preparation, and activities
related to the preparation, of documents in any format and the electronic transmission of
documents and parts of documents intended to be filed with CBP in furtherance of any other
customs business activity…"

45.     Following Novak's recommendation, the Plaintiffs entered into the initial
Customs Power of Attorney Agreement. See Ex. A.

46.     Upon information and belief, Novak and other XPO/RXO employees, including
but not limited to Defendants Bowerize and Murdock were responsible for servicing the
Plaintiffs' account were trained by XPO/RXO and had a familiarity with XPO/RXO's processes
and procedures as provider of freight forwarding and logistics services for XPO/RXO clients like
the Plaintiffs.

47.     Similarly, upon information and belief, Novak and other XPO/RXO employees,
including, but not limited to Bowerize and Murdock, were aware of the role of RLS as a customs
broker and familiar with RLS' coding processes and procedures related to the identification of
imported products, as well as RLS' responsibilities as to CBP filings for these imports.

48.     After the execution of the Power of Attorney, XPO/RXO, and not the Plaintiffs,
provided RLS with the documentation and information necessary to make CBP entry.

49.     XPO/RXO was not the Plaintiffs' Customs Broker of Record, however, upon information and belief, on numerous occasions, individuals employed by XPO/RXO, including Novak made recommendations and provided input and advise to RLS employees on the classification of the Plaintiffs' imported goods.

50.     Upon information and belief, during this time period, XPO/RXO billed the Plaintiffs for freight forwarding services as well as some customs-related service fees. These charges were passed along to the Plaintiffs by way of an XPO/RXO invoice, which also included the entry fee billed by RLS.

51.     At XPO/RXO, Novak arranged for the Plaintiffs to sign multiple subsequent Agreements, effectively renewing the Power of Attorney whereby RLS would serve as the Plaintiffs' Customs Broker of Record and also managed/oversaw the day-to-day duties of other XPO/RXO employees, including Bowerize and Murdock.

52.     Upon information and belief, Novak, Bowerize, Murdock and other XPO/RXO employees had discussions with the Plaintiffs regarding the Plaintiffs' imported goods and components. However, none of the Plaintiffs were aware that anyone at XPO/RXO, including, but not limited to Novak, Bowerize or Murdock was making customs coding and duty-related recommendations to anyone at RLS on their behalf.

53.     In early 2021, Novak and her team, including Bowerize and Murdock left XPO/RXO and started working for Defendant SEKO.

54.     Upon information and belief, Novak moved from XPO/RXO to SEKO with a book of business, including the Plaintiffs'.

55.     Upon information and belief this book of business, including the Plaintiffs' provided Novak with the opportunity to create a more lucrative arrangement and engagement with SEKO, which was more for beneficial to SEKO than the clients on Novak's roster.

56.     Upon information and belief, SEKO provides other customers customs broker of record services, however, for unknown reasons, upon joining SEKO, Novak recommended that the Plaintiffs renew their relationship with RLS.

57.     At no time relevant herein did Plaintiffs contract with SEKO to serve as anything other than their freight forwarding and logistics intermediary.

58.     Upon joining SEKO, Novak represented herself to be SEKO's Managing Director of the Columbus, Ohio office.

59.     Upon information and belief, Bowerize represented himself to be at various times SEKO's Station Manager and Director of Operations for the Columbus, Ohio office.

60.     Upon information and belief, Murdock represented himself as a SEKO employee tasked with Import Operations.

61.     When Novak Bowerize and Murdock moved to SEKO, SEKO replaced XPO/RXO as the intermediary facilitation and coordinating the Plaintiffs' imports.

62.     At all times relevant herein, Novak, Bowerize and Murdock represented themselves as SEKO employees with the actual and apparent authority to operate on behalf of SEKO.

63.     Upon information and belief, when Novak, Bowerize and Murdock joined SEKO they were trained by SEKO as to SEKO's processes and procedures as a freight forwarding and logistics company.

64.     Upon information and belief, upon joining SEKO, Novak, Bowerize and Murdock were privy to SEKO employee manuals, policies and procedures and undertook a duty to ensure compliance with those manuals, policies and procedures as SEKO employees.

65.     At all times relevant herein, upon information and belief, Novak, Bowerize and Murdock communicated with the Plaintiffs regarding the overseas manufacturing of their imported goods and components, but at no time was anyone affiliated with the Plaintiffs aware that anyone at SEKO, including, but not limited to Novak, Bowerize and Murdock was making CBP-related recommendations to RLS regarding HTS coding or other duty-related selections.

66.     Upon information and belief, from early 2021 until approximately, May 2022, SEKO billed the Plaintiffs for freight forwarding services as well as some customs-related service fees. These charges were passed along to the Plaintiffs by way of a SEKO invoice, which also included the entry fee billed by RLS.

67.     Section 637 of the Mod Act as well as Section 484 of the Tariff Act of 1930 (19 U.S.C. §1484) imposes the requirement that importers exercise reasonable care when classifying and appraising merchandise.

68.     Under the Mod Act, importers are required to exercise "reasonable care," which requires them to conduct themselves as a reasonable importer would under the circumstances with respect to importing prior to goods entering into the United States." (*See* Title VI of the North American Free Trade Agreement Implementation Act (Pub. L. 103-182, 107 Stat. 2057)).

69.     Reasonable care requires importers to "enter, classify and determine the value of imported merchandise and to provide any other information necessary to enable CBP to properly assess duties, collect accurate statistics and determine whether other applicable legal requirements, if any have been met." *Id.*

70. Pursuant to the terms of the Agreement, Plaintiff contracted with RLS to serve as Plaintiffs' customs broker to "make, endorse, sign, declare, or swear to any entry, withdrawal, declaration, certificate, bill of lading or other document required by law regulation in connection with the importation, transportation, or exportation of any merchandise shipped or consigned by or to [SpecGrade], to perform any act or condition which may be required by law or regulation in connection with such merchandise…" (*See* Ex. A).

71. Among the RLS' duties, as set forth by the Agreement, RLS was responsible "to make endorsements on commercial invoices, conferring authority to make entry and collect drawback, and to make, sign, declare or swear to any statement, supplemental statement, schedule, supplemental schedule, certificate of delivery, certificate of manufacture…"

72. The Agreement provides that among RLS' responsibilities and obligations is the coding of commercial invoices to ensure compliance with the US CBP requirements.

73. From December 2015 until May 6, 2022, RLS was responsible for using its specialized knowledge and expertise in the selection of HTS codes and categories as the fiduciary of Plaintiff SpecGrade in its interactions and filings with CBP.

74. However, from 2017 until approximately May 6, 2022 as discussed more thoroughly herein, RLS violated its requisite duty of reasonable care under the Mod Act, and carelessly utilized the same general, over-arching HTS code for nearly every single entry completed on behalf of Plaintiffs.

75. RLS held out Deku as an employee of RLS' Cincinnati, Ohio office with the requisite knowledge, training and expertise to serve as Plaintiffs' point of contact/account manager at RLS who was responsible for the selection and classification of all HTS codes and categories for Plaintiffs and received the benefits thereof, including payments from Plaintiffs.

76.     Upon information and belief, during this period from 2017 until May 2022, Novak and Bowerize representing themselves as acting on behalf of XPO/RXO and SEKO, also communicated with RLS employees, including Deku to provide their own insights and recommendations regarding the selection of HTS codes and categories for the Plaintiffs' imports.

77.     During this time XPO/RXO, SEKO and their employees, including, but not limited to Novak, Bowerize and Murdock were supposed to serve as the intermediary between the Plaintiffs' foreign manufacturers and RLS.

78.     The Plaintiffs did not authorize nor hire XPO/RXO, SEKO or their employees to make recommendations or selections for the purposes of completing CBP paperwork. Nevertheless, XPO/RXO, SEKO and Novak and Bowerize made these recommendations without the Plaintiffs' knowledge or authorization, and, upon information and belief, RLS relied upon those suggestions in completing CBP entries on behalf of the Plaintiffs.

79.     Upon information and belief, on or about September 6, 2019, RLS employee Defendant Damon emailed Bowerize and Novak at XPO/RXO asking specifically which HTS code a certain SpecGrade product should go under.

80.      Upon information and belief, on or about April 1, 2020, XPO/RXO's Bowerize emailed RLS employees Deku and Damon to recap a discussion with Deku that Bowerize had about whether the Plaintiffs' LED modules could be imported separately under an HTS code with a 2% duty. Damon replied "Noted," providing an HTS code, which was later used to classify some of the Plaintiffs' imports.

81.     The Plaintiffs were never informed nor aware that RLS was relying upon recommendations of XPO/RXO and its employees in the classification of its imports. Upon information and belief, it was the Plaintiffs' understanding that XPO/RXO and its employees

were simply providing RLS with the foreign manufacturer paperwork necessary to classify the Plaintiffs' imports.

82.     Upon information and belief, on or about April 8, 2020, RLS employee Damon emailed to directly ask XPO/RXO's Bowerize as to whether certain products being imported by the Plaintiffs should be classified under a specific HTS code, 9405.99.4090. RLS subsequently classified numerous entries incorrectly utilizing this recommended HTS code.

83.     Upon information and belief, between April 20 and 24, 2020 Bowerize, on behalf of XPO/RXO, emailed RLS' Deku and Damon suggesting that RLS utilize HTS code 9817.00.50 to import certain entries duty free.

84.     Despite RLS being the Plaintiffs' designated customs broker of record, pursuant to the Agreement, it appears as though RLS permitted its employees to code imports based on the recommendations of third parties, including Novak, Bowerize and Murdock.

85.     It is unknown whether or not Deku, Damon or any other RLS employee conducted further research to assess the appropriateness of the recommended HTS codes, or whether they simply "rubber stamped" these recommendations provided by XPO/RXO and SEKO employees.

86.     Upon information and belief, on or about April 8, 2021, SEKO employee Murdock emailed RLS employee Danielle Holt, informing her that based on the foreign manufacturer invoice, certain modules being imported by the Plaintiffs should be classified under HTS code 8539.50.0090 at a duty rate of 2%. In response, RLS' Deku replied with a revised CBP form "showing the duty amount change."

87.     On or about May 6, 2021 CBP communicated with Deku/RLS, pursuant to the Agreement and Deku forwarded to Plaintiffs a request for information from a CBP Import

Specialist requesting information related to specific entries of LED modules imported by Plaintiffs.

88.     Because CBP recognized him as having authority, CBP's initial 2021 correspondence requested Deku provide information for specific entries of LED modules imported under HTS 8539.50.0090.

89.     Upon information and belief, the Plaintiffs later learned that these specific modules were imported under HTS 8539.50.0090 as a result of the recommendations of XPO/RXO employees, including Bowerize.

90.     Upon being contacted by CBP, Deku and other RLS employees communicated with XPO/RXO, SEKO and Novak and Bowerize to provide responses and information to CBP.

91.     At no time during this initial CBP inquiry did Deku or RLS inform the Plaintiffs that XPO/RXO, SEKO and Novak, Bowerize and/or Murdock were assisting with the required responses to CBP.

92.     Upon information and belief, on or about September 8, 2021, Murdock instructed RLS to use a specific HTS code for certain of the Plaintiffs' imports and attached specific documentation "for customs clearance."

93.      RLS subsequently relied upon Murdock's instructions and documentation, and certain imports entered under this recommended HTS code were later found to be misclassified by CBP.

94.     Upon information and belief, in her management/supervisory role, Novak was copied on virtually all emails regarding the Plaintiffs that were exchanged between XPO/RXO and SEKO employees, including, but not limited Bowerize and Murdock and all RLS employees, including, but not limited to Deku and Damon.

95.     Upon information and belief, under Novak's management/supervision XPO/RXO and SEKO served as more than a mere conduit between XPO/RXO and SEKO and RLS on the Plaintiffs' behalf.

96.     On or about February 8, 2022, CBP, by way of communication to Deku/RLS, informed Plaintiffs that based on the responses provided, it agreed with the classification of LED Modules under HTS 8539.50.0090, which the Plaintiffs later learned were classified at the recommendation of XPO/RXO employees including Novak, Bowerize and Murdock, demonstrating a willful disregard of the duties and responsibilities as well as the common law obligations Deku and RLS owed the Plaintiffs as their customs broker of record.

97.     On or about February 8, 2022, CBP also informed Plaintiffs by way of Deku/RLS, that CBP was not in agreement with the classification of certain other entries filed by RLS on behalf of Plaintiffs during the past five years.

98.     After CBP conducted a review of spec sheets filed by RLS on behalf of Plaintiffs, it was determined that misclassifications occurred related to certain LED fixtures/light fixture parts, including LED high bay lighting fixtures, LED wedge light fixtures, LED flood light fixtures and LED projecting light fixtures (collectively, the "Fixture Products") under HTS 9405.40.8410 the code for lamps and lighting fixtures, including searchlights and spotlights and parts thereof.

99.     CBP identified incorrect classifications involving the Fixture Products as well as certain additional products and lighting parts ("Lighting Parts") that were also incorrectly classified by RLS on behalf of Plaintiffs.

100.    Upon information and belief, XPO/RXO, SEKO and those representing themselves as working for XPO/RXO and SEKO, including Novak, Bowerize and Murdock

16

were directly involved in the incorrect selection of HTS codes, which were subsequently relied upon by RLS without any knowledge of the Plaintiffs.

101. At all times relevant herein, both XPO/RXO and SEKO held out Novak, Bowerize and Murdock as working for XPO/RXO and SEKO with apparent or actual authority to dispatch duties and responsibilities on behalf of XPO/RXO and SEKO.

102. RLS also incorrectly made classifications for Packing, which were incorrectly classified as Fixture Products and/or Lighting Parts.

103. In order to comply with CBP, Plaintiffs submitted an initial prior disclosure on March 8, 2022.

104. Plaintiffs received a 30-day extension on April 1, 2022 from a CBP Import Specialist in order to review the universe of incorrect classifications, or undeclared royalties and any other identified Customs errors for the period of March 8, 2017 through March 2022 (the "Prior Disclosure Period").

105. In order to complete the Final Prior Disclosure, Plaintiffs first had to gain access to the Automated Commercial Environment ("ACE System"), the system through which the trade community reports imports and exports to allow the government (CBP) to determine admissibility. (*See* https://www.cbp.gov/trade/automated).

106. Prior to Spring 2022, Plaintiffs had no access to the ACE System, because they were entitled to rely upon RLS' specialized knowledge and expertise to utilize this portal and assign proper HTS codes, pursuant to the terms of the Agreement between Plaintiffs and RLS. And RLS represented that they would do this and that they would do this correctly.

107. It is unknown whether or not at the time their employees were making recommendations to RLS, whether XPO/RXO and SEKO provided access to the ACE System to

Novak, Bowerize and Murdock or any other employees. Therefore, it is unknown whether any of the Defendants consulted this System prior to providing their recommendations to RLS.

108.    It is further unknown whether or not Deku, Damon or any other RLS employees "checked the work" of Novak, Bowerize, Murdock or anyone from XPO/RXO or SEKO to ensure the HTS codes recommended were in fact even correct in conjunction with the Plaintiffs' imported goods.

109.    Upon information and belief, on or about March 2, 2022, RLS' Deku forwarded a CBP email with the subject line "LIGHTING SOLUTIONS GROUP LLC-REASONABLE CARE FOR GROSS MISCLASSIFICATION ISSUES" to SEKO's Bowerize recommending the Plaintiffs' undertake the prior disclosure process, and Deku suggested that RLS had a recommended firm to do this for the Plaintiffs.

110.    Upon information and belief in early March 2022 RLS, its employees and SEKO and its employees, including at least Bowerize and Novak participated in a teleconference with the Plaintiffs and their employees regarding the CBP inquiry and prior disclosure process.

111.    At no time during this teleconference did Novak or Bowerize inform the Plaintiffs that they had been making recommendations regarding HTS codes to RLS.

112.    Following this call, upon RLS' recommendation, the Plaintiffs retained the law firm Dentons to assist with the prior disclosure process at a significant expense to the Plaintiffs.

113.    During the Final Prior Disclosure review process, Plaintiffs and their employees engaged in a tedious line-by-line analysis of each, and every entry performed by RLS for the Prior Disclosure Period.

114.    During this review process Plaintiffs reviewed all of the entries made during the five-year period at issue here and found that 85.17% of the entry lines submitted by RLS on Plaintiffs' behalf were incorrectly misclassified.

115.    As a result of this review process, Plaintiffs determined that RLS utilized one specific HTS code over the course of representing the Plaintiffs--9405.40.8410, this code with a 3.9% Duty Rate is the HTS code assigned to "lamps, lighting fixtures including searchlights and spotlights and parts thereof, not elsewhere specified or included; illuminated signs, illuminated nameplates and the like, having a permanently fixed light source, and parts thereof not elsewhere specified or included: other electric lamps and lighting fittings: other lighting sets."

116.    RLS was using HTS code 9405.40.8410, the code essentially assigned to "other lighting sets" and applying a 3.9% duty rate across the board, regardless of what invoices of the products being imported stated.

117.    For example, in the Final Prior Disclosure, Plaintiffs identified a 300-watt LED flood light, classified by the Defendant at that 3.9% "other lighting set" duty rate, when there is a correct HTS code (9405.10.6020) at a 7.6% duty rate for that specific lighting product.

118.    This specific misclassification on the part of the RLS is just one example of the numerous underpayments that occurred, which ultimately resulted hundreds of thousands of dollars of penalties assessed by CBP against the Plaintiffs.

119.    In another instance, whereby Plaintiffs imported cardboard boxes, RLS erroneously coded cardboard under the "other lighting sets" HTS code 9405.40.8410 at a 3.9% duty rate.

120.    However, cardboard, including cartons and boxes has its own unique HTS code 4819.10.0040, which has a 0% duty rate. In this case, resulting in Plaintiffs overpaying as a result of RLS' erroneous coding.

121.    Plaintiffs' thorough review of its import transactions during the Prior Disclosure Period resulted in a calculated total net underpayment of duties in the amount of $337,252.14 which was tendered to CBP along with its Final Prior Disclosure. (*See* **Exhibit B** The Final Prior Disclosure of Lighting Solutions Group LLC (Importer-No. 27-246860600) Relating to Classification of Certain LED Lighting Fixtures and Certain Lighting Parts and Packaging was submitted to CBP on May 2, 2022 (the "Final Prior Disclosure")).

122.    The $337,242.14 amount constitutes a lump sum amount that Plaintiffs owed CBP in penalty for underpayments as a result of the Defendants misclassifications and incorrect CBP filings over a five-year period of time.

123.    But for the Defendants' widespread misclassifications, which unbeknownst to the Plaintiffs had been taking place over a period of five years, the Plaintiffs would not have had to tender what essentially constitutes five years' worth of CBP duties along with interest and penalties to CBP.

124.    While XPO/RXO, SEKO and their employees Novak, Bowerize and Murdock did not complete the required CBP paperwork containing the erroneous misclassifications, upon information and belief, the selection and utilization of the erroneous HTS codes by RLS was done so by RLS relying upon XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations and suggestions.

125.    But for RLS' misclassifications, based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations, Plaintiffs would not have had to retain the Dentons law firm to assist with the completion of the Final Prior Disclosure.

126.    But for RLS' misclassifications, based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations, Plaintiffs would not have had to tender this amount to CBP.

127.    Because of the deadline(s) associated with the Final Prior Disclosure process, Plaintiffs had to tender the full amount due to CBP or they ran the risk of additional monetary penalties and the threat of not being permitted to import good and components from overseas.

128.    Because the CBP penalty constituted payment of underpaid duties for a period of five years, the amount of the CBP penalty due was of an amount not ordinarily on hand in the accounts of Plaintiff SpecGrade. SpecGrade's payment would have effectively put the company out of business. SpecGrade therefore required a loan and received an infusion of cash from Plaintiff officers Nathans and Lauck in order to ensure the stability of the business. As a result, officer Plaintiffs Nathans and Lauck had to loan personal money to the company in order to comply with CBP.

129.    But for RLS' misclassifications, based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations, Plaintiff Nathans would not have had to liquidate his 401k account to provide a cash infusion in order for Plaintiff SpecGrade to pay CBP.

130.    Plaintiff Nathans has been penalized $47,911 in the form Federal Taxes resulting from the withdrawal of his 401k.

131.     In order to provide a cash infusion to Plaintiff SpecGrade in order to furnish the penalty levied by CBP, Plaintiff Lauck was forced to take out a loan on his 401k in the amount of $38,045.53.

132.    Plaintiffs paid RLS approximately $42,560.00 for the entries made by RLS on Plaintiffs' behalf during the Prior Disclosure Period.

133.    On May 4, 2022 counsel for Plaintiffs sent a communication to Deku, as RLS' representative/employee who was responsible for and assigned to determine all of Plaintiffs' CBP filings, informing him of Plaintiffs' damages and seeking a resolution of this matter.

134.    On May 13, 2022 having heard nothing from Deku, counsel for Plaintiffs sent a follow-up communication informing RLS that if the parties were unable to resolve this matter Plaintiffs would be filing this Complaint.

135.    On May 13, 2022 counsel for Plaintiffs mailed copies of the May 4 and May 13, 2022 communications to RLS' President and Chief Operating Officer Charles "Chas" Watson.

136.    Following the mailing of the communications to RLS' President and COO, counsel for Plaintiffs was contacted by Cameron Roberts, counsel for RLS.

137.    On June 23, 2022, CBP notified Plaintiffs by email to inform them that CBP had completed its review of Plaintiffs' Initial Prior Disclosure. At this time Plaintiffs were informed that CBP required additional information and a revised spreadsheet providing classification as to the mathematical formulas replied upon by Plaintiffs in reaching its calculation conclusions.

138.    On June 23, 2022, by and through counsel, Plaintiffs responded to CBP with updated totals for March 3, 2017-April 27, 2022 with a new and corrected total loss of revenue of $329,011.52.

139.    On October 5, 2022 Plaintiffs received an email from CBP informing them that some of the entries on the revised spreadsheet were already liquidated and denied. CBP requested an updated Prior Disclosure from Plaintiffs to submit to a "Regulatory Audit for an offsetting review."

140.     On October 7, 2022, by and through counsel, Plaintiffs provided CBP with a list of 27 entries that had been removed following the completion of CBP's Post Summary Corrections ("PSC") process. Plaintiffs also provided a revised spreadsheet reflecting the adjusted loss of revenue with underpayments and overpayments identified. Plaintiffs requested that any bills generated by CBP's PSC be paid from the May 2022 tender of $337,252.14.

141.     On March 21, 2023, CBP informed Plaintiffs that CBP's Regulatory Audit approved offsetting for $45,613.99 and that an additional tender of $4,338.91 was due to CBP.

142.     On March 22, 2023 CBP informed Plaintiffs that along with the additional tender of $4,338.91, an interest penalty of $24,895.74 was also due to CBP related to the misclassifications and errors on the part of RLS, which were based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations.

143.      On March 22, 2023 Plaintiffs issued a check in the amount of $29,234.65 to CBP via FedEx Overnight Delivery. As communicated to Plaintiffs by CBP, this payment covered all outstanding debts for Plaintiffs' Prior Disclosure.

144.     On March 27, 2023 CBP provided a letter, attached hereto as **Exhibit C**, which accepted Plaintiffs' Prior Disclosure and stated that CBP having received a total of $366,486.79 from Plaintiffs, the Prior Disclosure is now considered closed.

145.     As a direct and proximate result of RLS' actions, including misclassifications and coding errors, based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations, the Plaintiffs have been damaged in a monetary amount to be proven at trial.

## COUNT I: BREACH OF CONTRACT
### (Defendants RLS)

146.     Plaintiffs restate and reincorporate Paragraphs 1-145 of the Complaint as if fully set forth herein.

147. In serving as Plaintiffs' Customs Power of Attorney and/or Designated Export Agent, Defendant was responsible for understanding the Plaintiffs' business to which it was entrusted, especially as it pertained to the selection of HTS coding and classifications to ensure compliance with the US CBP requirements.

148. RLS breached the Agreement because their employees, including, but not limited to Deku and Damon, incorrectly misclassifying 85% of the lines it was responsible for classifying on behalf of the Plaintiffs.

149. Plaintiffs entered into the Agreement and relied upon RLS for its expertise and specialized knowledge regarding the complex nature of the HTS.

150. Plaintiffs hired RLS and RLS only to serve as its Customs Broker of Record pursuant to the Agreement.

151. RLS breached the Agreement by relying upon the recommendations of XPO/RXO, SEKO, Novak, Bowerize and Murdock to select certain incorrect or inapplicable HTS codes to import the Plaintiffs' products and components from overseas.

152. RLS breached the Agreement by failing to disclose to the Plaintiffs that they were not solely responsible for the selection of relevant HTS codes to classify Plaintiffs imported goods.

153. In seeking recommendations from, relying upon those recommendations and subsequently utilizing those recommendations to complete CBP paperwork, as required by the Agreement, RLS breached the agreement and acted with willful and reckless disregard for the obligations imposed upon RLS by the Agreement.

154. In making and submitting CBP classifications at the recommendation or at the direction of XPO/RXO and SEKO, RLS acted with a willful disregard of the duties and

responsibilities and common law obligations imposed upon it as the Plaintiffs' customs broker of record, including, but not limited to the CBP imposed duty of reasonable care.

155.    RLS breached the Agreement by utilizing the same HTS code of "other lighting sets" at a 3.9% duty rate, regardless of whether the product being imported had its own unique, specific HTS code and corresponding duty rate.

156.    These misclassifications resulted in Plaintiffs' having to tender a total of $366,486.79 to CBP as a penalty resulting from the under-payment of certain duties as a result of the incorrect classifications made by the RLS on Plaintiffs' behalf.

157.    Plaintiffs paid RLS approximately $42,560.00 for the entries made by RLS and its employees, including, but not limited to Deku and Damon on Plaintiffs' behalf during the Prior Disclosure Period.

158.    Plaintiffs have suffered numerous other consequential damages resulting from the RLS' misclassifications, among which includes loss of personal and investment opportunities and penalties resulting from the liquidation of well-managed accounts by officer Plaintiffs Nathans and Lauck in order to tender the CBP penalty.

159.    Plaintiffs have further suffered other consequential damages resulting from the RLS' misclassifications, including costs associated with retaining consultants and labor associated with the line-by-line review process necessary to complete the Final Notice of Prior Disclosure.

160.    Plaintiffs Nathans and Lauck have further suffered damages in an amount to be proven at trial.

## COUNT II: DECLARATORY JUDGMENT
### (Defendant RLS)

161.    Plaintiffs restate and reincorporate Paragraphs 1-160 of the Complaint as if fully set forth herein.

162.    An actual and immediate controversy has arisen and now exists between the Plaintiffs and RLS regarding the legality and effect of the Terms and Conditions of Service, which purport to be attached to the Agreement.

163.    The Plaintiffs seek a declaration of their rights under Fed. R. Civ. P. 57 and the Declaratory Judgment Act as to the applicability and effect of the Terms and Conditions of Service ("Terms and Conditions") which may or may not be incorporated into and/or attached to the Customs Power of Attorney between Plaintiffs and Defendant RLS.

164.    Specifically, the Plaintiffs are not in possession any signed or initialed copy of the Terms and Conditions which demonstrate the Plaintiffs' "confirmation of acceptance," despite renewing and/or signing subsequent versions of the Power of Attorney during the course of the parties' relationship. (See Ex. A page 6).

165.    Further, a declaratory judgment is necessary regarding the enforceability and applicability of the Terms and Conditions because the Terms and Conditions contain specific language regarding an alleged limitation of liability on RLS' part.

166.    Specifically, Section 9 "Disclaimers; Limitation of Liability" provides that [RLS]' liability shall be limited to the following (i) where the claim arises from activities other than those relating to customs business, $100.00 per shipment or transaction, or (ii) where the claim arises from activities relating to 'Customs business,' $100.00 per entry or the amount of brokerage fees paid to [RLS]."

167.    The Terms and Conditions are silent as to the definitions of "Customs business," "entry," "transaction" and "shipment."

168.     Because RLS will undoubtedly rely on this provision of the Terms and Conditions to avoid liability for their classifications and incorrect CBP filings, a declaratory judgment is necessary to determine, if applicable, how the Terms and Conditions define the terms "Customs business," "entry," "transaction" and "shipment."

169.     Because there are questions regarding the enforceability of the Terms & Conditions and because the Terms and Conditions contain provisions with undefined key terms, discovery is appropriate and required in order to develop the situational and factual questions to appropriately permit the Court to ascertain the parties' rights and obligations under the Terms & Conditions.

## COUNT III: UNJUST ENRICHMENT
### (All Defendants)

170.     Plaintiffs restate and reincorporate Paragraphs 1-169 of the Complaint as if fully set forth herein.

171.     Plaintiffs retained RLS to act as their Customs Broker.

172.     Plaintiffs paid RLS for each entry processed by RLS. For all entries processed by RLS from 2017 through March 2019, Plaintiffs were charged $75 per entry made by RLS. Beginning in April 2019, RLS charged Plaintiffs $81 per entry.

173.     In an industry standard arrangement, RLS bills Plaintiffs for each entry fee as a pass-through to Plaintiffs' freight forwarding and logistics company, first XPO/RXO and then SEKO, which passed those fees on to the Plaintiffs.

174.     XPO/RXO and then SEKO provided freight forwarding and logistics invoices to the Plaintiffs, including not only the RLS entry fee, but also freight forwarding, costs and other fees, which the Plaintiffs paid XPO/RXO and then SEKO for each of the shipments at issue here.

175. All of the individual Defendants were subsequently compensated for their roles in servicing the Plaintiffs.

176. At issue here are misclassifications of parts and products by RLS, which occurred within the Prior Disclosure Period of March 8, 2017 through March 2022.

177. The universe of classifications for this five-year period included a list of all entries made by RLS. Of those entries, it was determined that RLS incorrectly misclassified 85% of the entry lines RLS made on Plaintiffs' behalf based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations.

178. During this five-year period, RLS received and accepted payment entry fees for all of the entries at issue here.

179. Plaintiffs paid RLS approximately $42,560.00 for the entries made by RLS on Plaintiffs' behalf during the Prior Disclosure Period.

180. Because the RLS misclassifications resulted in both under and overpayments to CBP, on May 2, 2022, Plaintiffs tendered $366,486.79 to CBP representing the amount due to CBP offset by the underpayment of certain duties as a result of the incorrect classifications.

181. At all times relevant hereto XPO/RXO and SEKO invoiced the Plaintiffs for freight forwarding costs and other fees related to the importation of the items at issue here, which were incorrectly classified, based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations.

182. As a result of the incorrect CBP classifications, all of the Defendants have been unjustly enriched.

183. Allowing all Defendants to retain the benefit of payment for these errors in classification would be unjust.

184.    By reason of the unjust enrichment of RLS, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

### COUNT IV—NEGLIGENT HIRING, SUPERVISION & RETENTION
**(Defendants RLS, SEKO, XPO, RXO, Novak)**

185.    Plaintiffs restate and reincorporate Paragraphs 1-184 of the Complaint as if fully set forth herein.

186.    Defendant held out Deku, Damon and other employees as employees of Defendant's Cincinnati, Ohio office with the requisite knowledge, training and expertise to serve as Plaintiffs' point of contact at RLS.

187.    Specifically, Deku served as RLS' account manager for the Plaintiffs, responsible for the selection and classification of all HTS codes and categories for Plaintiffs.

188.    Plaintiffs entered into the Agreement at issue here based upon RLS' purported expertise and extensive experience as a customs broker.

189.    Employees of the company, including, but not limited to Deku and Damon assigned HTS codes, reviewed, acknowledged, signed and filed official CBP paperwork and forms on behalf of Plaintiffs with approval and knowledge of RLS.

190.    With that understanding in mind, Plaintiffs were under the impression that RLS' employment staff members, including Deku, Damon and other employees, included ensuring that these employees were properly trained, supervised and experienced in the changing customs landscape, specifically as it relates to HTS codes and the selection thereof.

191.    According to RLS' own representations on its website, "[w]e employee our own staff of skilled customs brokerage specialists. This expertise means that you get accuracy in classification, customer service responsiveness and a confidence level that's second to none." (*See* https://www.rlswearer.com/CustomsBrokerage.asp).

192.     The universe of classifications for the five-year period at issue here included a list of all entries made by RLS. Of those entries, it was determined that RLS incorrectly misclassified 85% of the entry lines RLS made on Plaintiffs' behalf based on XPO/RXO, SEKO, Novak, Bowerize and Murdock's recommendations.

193.     Upon information and belief, in her role at XPO/RXO, Novak was responsible for the supervision of XPO/RXO employees, including, but not limited to Bowerize and Murdock, who were employed to service the Plaintiffs' account.

194.     Any activities on behalf of XPO/RXO that employees, including, but not limited to Bowerize and Murdock engaged in on the Plaintiffs' behalf, including communicating with RLS were overseen by Novak.

195.     Upon information and belief, Novak was copied on virtually all of the communications between Bowerize and Murdock and RLS employees, including, but not limited to Deku and Damon pertaining to the Plaintiffs' imported goods and components.

196.     Upon information and belief these communications included emails from XPO/RXO's Bowerize and Murdock making recommendations and discussing the selection of HTS codes with RLS employees, including but not limited to Deku and Damon.

197.     RXO/XPO failed to provide adequate supervision and/or oversight for the actions of Novak in her supervisory role at their Columbus, Ohio office.

198.     Novak failed to provide adequate supervision and/or oversight of her employees, including, but not limited to Bowerize and Murdock, which resulted in the misclassifications at issue here.

199.    Similarly, upon information and belief, in her role at SEKO as Managing Director, Novak was responsible for bringing over Bowerize and Murdock to SEKO, as well as managing and supervising them as employees, including in their roles continuing to oversee the Plaintiffs' client account as it transitioned to SEKO.

200.    Upon information and belief, Novak was copied on virtually all communications between Bowerize and Murdock and RLS employees, including, but not limited to Deku and Damon pertaining to the Plaintiffs' client account, imported goods and components.

201.    Upon information and belief these communications included emails from SEKO's Bowerize and Murdock making recommendations and discussing the selection of HTS codes with RLS employees, including but not limited to Deku and Damon.

202.    SEKO failed to provide adequate supervision and/or oversight for the actions of Novak her supervisory role at its Columbus, Ohio office.

203.    Novak failed to provide adequate supervision and/or oversight of her employees, including, but not limited to Bowerize and Murdock, which resulted in the misclassifications at issue here.

204.    The Plaintiffs never contracted for or had any basis to believe that anyone other than RLS and its employees were conducting the requisite research and subsequent selection of classification codes on behalf of the Plaintiffs.

205.    But for Deku, Damon and/or other employees' misclassifications and the application of the same broad, inaccurate HTS code across 1941 lines, Plaintiffs would not have had to tender $366,486.79 to CBP, representing the amount due to CBP offset by the underpayment of certain duties as a result of RLS' incorrect classifications and the Defendants' course of conduct over a five-year period.

31

206.    These employees' actions on behalf of the RLS are the proximate cause of the CBP investigation and the damages the Plaintiffs incurred as a result of the CBP investigation and CBP-imposed penalties.

207.    RLS failed to provide adequate supervision and/or oversight for the actions of its employees, including, but not limited to Deku and Damon, which resulted in the misclassifications at issue here.

208.    As an employer, RLS owed a legal duty to its customers, (the Plaintiffs), to exercise reasonable care and caution in its hiring, training, supervision, and retention of its employees, including, but not limited to Deku and Damon.

209.    RLS breached that legal duty to Plaintiffs and failed to provide the promised "accuracy in classifications" that it claims makes it an expert in the customs brokerage field.

210.    As a result of RLS' negligent hiring, supervision and retention, Plaintiffs have been damaged in an amount to be proven at trial.

211.    During the prior disclosure period at issue here, XPO/RXO and then SEKO served as the freight forwarding and logistics company intermediaries who would communicate relevant information including invoices and Bills of Lading to RLS in order for RLS to complete the required CBP paperwork for each of the Plaintiffs' imports.

212.    Unbeknownst to the Plaintiffs, XPO/RXO, SEKO and those who represented themselves as employees of XPO/RXO and SEKO, including, but not limited to Novak, Bowerize and Murdock undertook a duty beyond the scope of their responsibilities as freight forwarders and logistics providers to make recommendations, suggestions and offer advice regarding the HTS code classifications for the Plaintiffs' imported merchandise and components.

213.     These individuals who held themselves out to the Plaintiffs as XPO/RXO and SEKO employees who were supervised by XPO/RXO and SEKO exceeded the scope of their employment and acted recklessly and at times incompetently recommending HTS codes that RLS later relied upon to complete the Plaintiffs' required CBP entry paperwork.

214.     XPO/RXO and SEKO were aware that its employees Novak, Bowerize and Murdock were overseeing the Plaintiffs' account and were subsequently compensated by the Plaintiffs.

215.     These employees' actions in recommending HTS classification codes on behalf of XPO/RXO and SEKO are the proximate cause of the CBP investigation because RLS relied upon those recommendations.

216.     XPO/RXO and SEKO failed to provide adequate supervision and/or oversight for the actions of its employees, including, but not limited to Novak, Bowerize and Murdock which resulted in the misclassifications at issue here.

217.     As an employer, XPO/RXO and SEKO owed a legal duty to its customers, (the Plaintiffs), to exercise reasonable care and caution in its hiring, training, supervision, and retention of its employees, including, but not limited to Novak, Bowerize and Murdock.

218.     As a result of XPO/RXO and SEKO's negligent hiring, supervision and retention, Plaintiffs have been damaged in an amount to be proven at trial.

### COUNT V—NEGLIGENCE
**(Defendants XPO/RXO, SEKO, Novak, Bowerize, Murdock)**

219.     Plaintiffs restate and reincorporate Paragraphs 1-218 of the Complaint as if fully set forth herein.

220.     Here, XPO/RXO and SEKO were hired by the Plaintiffs to serve as freight forwarding and logistics intermediaries, handling communications between the Plaintiffs' overseas manufacturers and RLS.

221.     Specifically, XPO/RXO and SEKO and their employees owed the Plaintiffs a duty of reasonable care to provide all required paperwork, including Bills of Lading to RLS to enable RLS as the Plaintiffs' customs broker of record, to accurately complete the required CBP paperwork for the importation of the Plaintiffs' goods and components.

222.     As employees of RXO/XPO and SEKO, Novak, Bowerize and Murdock owed the Plaintiffs a duty to exercise reasonable care in serving as an intermediary on behalf of the Plaintiffs when communicating with RLS.

223.     Novak, Bowerize and Murdock were not tasked with serving in any capacity as customs brokers on behalf of the Plaintiffs.

224.     Nevertheless, Novak, Bowerize and Murdock endeavored to provide RLS with recommendations, suggestions and other information regarding the selection of HTS codes for RLS to use for the classification of the Plaintiffs' imports on CBP entry forms.

225.     RLS relied upon these recommendations in selecting the HTS codes it input on required CBP forms on behalf of the Plaintiffs.

226.     Here, Novak, Bowerize and Murdock failed to exercise reasonable care as to the accuracy and applicability of the HTS codes they suggested RLS use on behalf of the Plaintiffs.

227.     The suggestions of Novak, Bowerize and Murdock served as the basis for the CBP inquiry into the Plaintiffs' importations.

228.     RLS employees, including, but not limited to Deku and Damon subsequently relied upon the suggestions of Novak, Bowerize and Murdock to complete the required CBP paperwork for Plaintiffs' imported goods.

229.     Upon information and belief, Deku and Damon failed to review or research the recommendations of Novak, Bowerize and Murdock to ensure that they were correct before completing CBP paperwork on the Plaintiffs' behalf.

230.     As a result of this failure, the Plaintiffs incurred significant CBP penalties and other expenses.

231.     In conjunction with its inquiry, CBP determined that the Plaintiffs (by way of the CBP documentation submitted by RLS on the Plaintiffs' behalf) were at least negligent, if not grossly negligent in violation of 19 U.S.C. §1592.  See Exhibit C.

232.     CBP adjudicated that the misclassifications, which occurred due to the negligence of Novak, Bowerize and Murdock, which occurred over the five-year period at issue here were due to a failure to exercise reasonable care in the importation process.

233.     Specifically, that the CBP documentation completed on behalf of the Plaintiffs resulted in the introduction of merchandise into the United States by means of "documents or electronically transmitted data or information…which was material and false or [contained] material omissions." 19 U.S.C. §1582(a).

234.     As a result of the negligence of Novak, Bowerize and Murdock in making recommendations to RLS employees, including but not limited to Deku and Damon, which RLS in turn relied upon to complete CBP entries on the Plaintiffs' behalf, the Plaintiffs were damaged in an amount to be proven at trial.

**COUNT VI—RESPONDEAT SUPERIOR**
**(Defendants XPO, RXO and SEKO)**

235.    Plaintiffs restate and reincorporate Paragraphs 1-234 of the Complaint as if fully set forth herein.

236.    At all times relevant hereto, Novak, Bowerize and Murdock represented themselves as employees of XPO/RXO and then SEKO acting on their employer's behalf when serving the Plaintiffs' accounts.

237.    As individuals holding themselves out as employees of RXO/XPO and SEKO, Novak, Bowerize and Murdock acted negligently in making recommendations, suggestions and offering advice regarding HTS code selection for Plaintiffs' imports to RLS.

238.    At all times relevant herein, XPO/RXO and SEKO held these individuals out as working for XPO/RXO and SEKO as employees with actual or apparent authority to discharge duties and responsibilities on behalf of XPO/RXO and SEKO.

239.    Because the Plaintiffs were damaged as a result of RLS' reliance on Novak, Bowerize and Murdock's recommendations, XPO/RXO and SEKO, as their employers are liable under the doctrine of Respondeat superior.

240.    Here, it was reasonable for Novak, Bowerize and Murdock to communicate with RLS on behalf of the Plaintiffs because XPO/RXO and SEKO were hired by the Plaintiffs to serve as an intermediary between their overseas manufacturers and RLS.

241.    Therefore, it is reasonable that XPO/RXO and SEKO would be held liable for the negligence of its employees under agency theory.

242.    Even though the Plaintiffs were unaware of the actions of XPO/RXO and SEKO and Novak, Bowerize and Murdock in providing recommendations to RLS regarding classification codes, it was later discovered that some of the fees XPO/RXO and SEKO charged

the Plaintiffs, were at least in part related to certain customs-related services, which were assessed by XPO/RXO and SEKO on top of the CBP entry fees RLS charged the Plaintiffs.

243.   In charging the Plaintiffs these customs-related service fees XPO/RXO and SEKO effectively co-signed the negligent behavior of their employees.

244.   As a result of these actions, the Plaintiffs have been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiffs Lighting Solutions Group, LLC d/b/a SpecGrade LED, Rick Nathans and Gerald Lauck demand judgment against Defendants RLS, XPO/RXO, SEKO, Novak, Bowerize, Murdock, Deku and Damon for damages of at least and exceeding $366,486.79, together with entry fees for the incorrect entries at issue here, along with other consequential damages to be proven at trial, including costs, attorney's fees, and such other and further relief as this Honorable Court deems just and appropriate under the circumstances.

## JURY DEMAND

Plaintiffs request a jury trial on all issues so triable.


Dated this 12th day of April 2024.

*/s/ Shelby J. Nathans*
Eliott R. Good (0025635)
Shelby J. Nathans (0096248)
Good Law Co., LPA
2808 Fair Avenue
Columbus, Ohio 43209
(614) 208-8903
(614) 413-3945
ergood@chorgood.com
sjnathans@chorgood.com

*Attorneys for Plaintiffs SpecGrade LED, Rick Nathans and Gerald Lauck*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, a true and correct copy of the foregoing was electronically

served upon counsel for the Defendants.


Dated: April 12, 2024

<i><u>/s/ Shelby J. Nathans</u></i>